**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MARISELA HERRERA, LUZ SANCHEZ,
NICHOLAS ACOSTA, and PENNY
WOLLMEN, individually and on behalf of
others similarly situated,

        Plaintiffs,

v.

JFK MEDICAL CENTER LIMITED
PARTNERSHIP d/b/a JFK MEDICAL
CENTER; MEMORIAL HEALTHCARE
GROUP, INC., d/b/a MEMORIAL
HOSPITAL JACKSONVILLE; NORTH
FLORIDA REGIONAL MEDICAL
CENTER, INC., and HCA HOLDINGS,
INC.,

        Defendants.
_____/

CASE NO:  8:14-cv-02327-T30-JSM

**CLASS ACTION**

**AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, Plaintiffs

MARISELA HERRERA, LUZ SANCHEZ, NICHOLAS ACOSTA, and PENNY WOLLMEN,

individually and on behalf of all others similarly situated, hereby file suit against Defendants,

JFK MEDICAL CENTER LIMITED PARTNERSHIP; MEMORIAL HEALTHCARE GROUP,

INC.; NORTH FLORIDA REGIONAL MEDICAL CENTER, INC., and HCA HOLDINGS,

INC., and allege:

Case 8:14-cv-02327-JSM-TBM   Document 24   Filed 10/15/14   Page 2 of 39 PageID 548

Herrera, et. al. v. JFK Medical Center, et. al.
Amended Complaint
Page 2

## I.    INTRODUCTION

1.    Plaintiffs Marisela Herrera, Luz Sanchez, Nicholas Acosta, and Penny Wollmen bring this Class Action Complaint against JFK Medical Center Limited Partnership, doing business under the name JFK Medical Center; Memorial Healthcare Group, Inc., doing business under the name Memorial Hospital Jacksonville; North Florida Regional Medical Center, Inc.; and HCA Holdings, Inc., challenging Defendants' unreasonable, unconscionable, and unlawful pricing and billing practices with respect to Plaintiffs and other similarly-situated patients who received emergency medical treatment at an HCA-operated facility in Florida following a motor vehicle accident and were billed exorbitant and unreasonable charges for radiological services partially covered through their Florida Personal Injury Protection insurance coverage ("PIP").

2.    PIP is required of all drivers in Florida.  By statute, hospitals treating patients covered by PIP may charge the insurer and the injured party only a "reasonable amount" for services and supplies rendered. § 627.736(5)(a), Fla. Stat. The charge for such services and supplies "may not exceed the amount the person or institution customarily charges for like services or supplies" and the "reasonable amount" for such services and supplies is directly related to the "usual and customary charges and payments accepted by the provider" for such services and supplies, as well as "reimbursement levels in the community" and "federal and state medical fee schedules." *Id*.

3.    With numerous emergency care facilities in Florida, Defendants see thousands of patients each year, many of whom receive imaging studies, such as CT scans, MRIs, Ultrasounds, and X-rays (collectively referred to as "Radiological Services").

4.      In direct contravention of the Florida Motor Vehicle No-Fault Law ("PIP Statute"), HCA-operated facilities in Florida, including, but not limited to, Defendants JFK Medical Center, Memorial Hospital Jacksonville, and North Florida Regional Medical Center, charge well in excess of the "reasonable amount" for Radiological Services provided to PIP-covered patients.  Upon information and belief, the HCA hospitals and emergency facilities charge PIP patients rates for Radiological Services that are up to 65 times higher than the hospitals' usual and customary charges and/or payments accepted for similar Radiological Services for non-PIP patients.

5.      These exorbitant and unreasonable charges harm Plaintiffs in two different ways. First, because PIP covers only 80% of the emergency medical care received, up to $10,000, § 627.736(1)(a)(3), Fla. Stat., the exorbitant and unreasonable charges leave Plaintiffs responsible for part of Defendants' inflated bills. Second, the exorbitant and unreasonable charges prematurely exhaust the PIP coverage available to Plaintiffs, resulting in Plaintiffs having to pay out of pocket for additional medical services that would otherwise have been covered under PIP.

6.      Plaintiffs bring this class action on behalf of themselves and all other similarly-situated individuals (or their guardians or representatives) who received PIP-covered emergency care Radiological Services at an HCA-operated facility in Florida and who either: (a) were billed by the facility for any portion of the charges for such services; and/or (b) had their $10,000 of PIP coverage prematurely exhausted by the facility's charges for such services and, as a result, were billed for additional medical services rendered by the facility and/or third-party providers that would otherwise have been covered under PIP.

## II.      JURISDICTION

7.      This is a class action for damages that exceed $5,000,000, exclusive of interest and costs.

8.      Plaintiff Herrera is a citizen and resident of Florida, over the age of eighteen years, and otherwise *sui juris*.

9.      Plaintiff Sanchez is a citizen and resident of Florida, over the age of eighteen years, and otherwise *sui juris*.

10.      Plaintiff Acosta is a citizen and resident of Florida, over the age of eighteen years, and otherwise *sui juris*.

11.      Plaintiff Wollmen is a citizen and resident of Florida, over the age of eighteen years, and otherwise *sui juris*.

12.      Defendant JFK Medical Center Limited Partnership is a Delaware partnership, whose partners are not citizens of Florida, authorized to do business and doing business in Florida. Its principal place of business is One Park Plaza, Nashville, Tennessee. It is a subsidiary or affiliate of Defendant HCA Holdings, Inc., and owns JFK Medical Center, located in Atlantis, Florida. JFK Medical Center Limited Partnership, which does business under the JFK Medical Center, is engaged in substantial, continuous, systematic, and non-isolated business activity within the state of Florida. It is subject to personal jurisdiction in the state of Florida because it regularly conducts business in the state of Florida and it committed the tortious acts alleged herein in the state of Florida.   On its website, JFK openly acknowledges its affiliation with HCA.

13.     Defendant Memorial Healthcare Group, Inc., is a Florida corporation whose principal place of business is One Park Plaza, Nashville, Tennessee, and, therefore, is a citizen of both Florida and Tennessee under 28 U.S.C. § 1332(c)(1). It is a subsidiary or affiliate of Defendant HCA Holdings, Inc., and owns Memorial Hospital Jacksonville, located in Jacksonville, Florida. Defendant Memorial Healthcare Group does business under the name Memorial Hospital Jacksonville. On its website, Memorial Hospital Jacksonville openly acknowledges its affiliation with HCA.

14.     Defendant North Florida Regional Medical Center, Inc., is a Florida corporation whose principal place of business is One Park Plaza, Nashville, Tennessee, and, therefore, is a citizen of both Florida and Tennessee under 28 U.S.C. § 1332(c)(1). It is a subsidiary or affiliate of Defendant HCA Holdings, Inc., and owns North Florida Regional Medical Center, located in Gainesville, Florida.  On its website, North Florida Regional Medical Center openly acknowledges its affiliation with HCA.

15.     Defendant HCA Holdings, Inc., ("HCA") is a Delaware corporation whose principal place of business is One Park Plaza, Nashville, Tennessee.  HCA is authorized to do business and doing business throughout Florida through approximately 80 HCA-owned and operated hospitals, medical centers and surgical centers, among them JFK Medical, Memorial Hospital Jacksonville, and North Florida Regional Medical Center.  Venue is proper in this District, where HCA maintains an agent or other representative, and conducts business through its numerous subsidiaries, including hospitals, medical centers and surgical centers owned or operated by subsidiaries or affiliates of HCA. These facilities include Tampa Community Hospital, Memorial Hospital in Tampa, Brandon Regional Hospital,

Brandon Regional Hospital Emergency Center at Plant City, South Bay Hospital, Blake Medical Center, Central Florida Regional Hospital, Edward White Hospital, Fawcett Memorial Hospital, Ocala Regional Medical Center, and Osceola Regional Medical Center. HCA is engaged in substantial, continuous, systematic and non-isolated business activity within the state of Florida. HCA is subject to personal jurisdiction in the state of Florida because it regularly conducts business in the state of Florida and it committed the tortious acts alleged herein in the state of Florida.

16.     Defendant HCA owns, operates and controls the activities of the other hospital defendants, and shares the same location as its principal place of business—One Park Plaza, Nashville, Tennessee.  In public documents, HCA makes clear that it does more than simply monitor its subsidiary hospitals – to the contrary, HCA is directly involved in setting and enforcing hospital guidelines and is specifically involved in the billing practices of these hospitals. In HCA's Annual Report for 2013, filed with the Securities and Exchange Commission, HCA explains that as of "December 31, 2013, [*it*] operated 165 hospitals, comprised of 159 general, acute care hospitals; five psychiatric hospitals; and one rehabilitation hospital."[1]

17.     HCA's strict control of its subsidiary hospitals is further confirmed in its 2013 Annual Report where it notes that HCA imposes a "Code of Conduct" that is applicable to all its directors, officers, and employees.[2] The Code of Conduct is found on HCA's Website,

---

[1] HCA's 2013 Annual Report to Stockholders, *available at*
http://investor.hcahealthcare.com/sites/hcahealthcare.investorhq.businesswire.com/files/report/file/HCA_2013_Annual_Report.pdf, at p. 3.
[2] *Id*. at 84.

*Cohen Milstein Sellers & Toll, PLLC*
*2925 PGA Boulevard, Suite 200, Palm Beach Gardens, FL 33410*
*Telephone: (561) 515-1400   Facsimile (561) 515-1401*

and attached hereto as <u>Exhibit A</u>. HCA's Code of Conduct delineates and specifies HCA's mission for quality patient care and the conduct it expects from its hospital employees. In its Code of Conduct, HCA states that: "Our Code of Conduct provides guidance to all HCA colleagues and assists us in carrying out our daily activities within appropriate ethical and legal standards. These obligations apply to our relationships with patients, affiliated physicians, third-party payers, subcontractors, independent contractors, vendors, consultants, and one another." (<u>Ex. A</u> at 4).

18.    With respect to patient care, HCA states the following in its Code of Conduct:

a.  "We are committed to providing quality care that is sensitive, compassionate, promptly delivered, and cost effective." (<u>Ex. A</u> at 7);

b.  "Our mission is to provide high quality, cost effective healthcare to all of our patients. To that end, we are committed to the delivery of safe, effective, efficient, compassionate and satisfying patient care. We treat all patients with warmth, respect, and dignity and provide care that is both necessary and appropriate. HCA has a comprehensive program to promote the quality objectives of the organization." (<u>Ex. A</u> at 8);

c.  "Each patient is provided with a written statement of patient rights and a notice of privacy practices. Whenever possible, this notice of patient rights is provided before providing or stopping care in a language or manner that the patient (or patient's representative) can understand." (<u>Ex. A</u> at 9);

    d.    "HCA facilities maintain an ongoing, proactive patient safety effort for the identification of risk to patient safety and the prevention, reporting and reduction of healthcare errors." (Ex. A at 10);

    e.    "We collect information about the patient's medical condition, history, medication, and family illnesses in order to provide quality care." (Ex. A at 11);

    f.    "We have implemented policies, procedures and systems to facilitate accurate billing to government payers, commercial insurance payers, and patients." (Ex. A at 15); and

    g.    "We expect those physicians [who treat patients in our facilities] to provide us with complete and accurate information in a timely manner." (Ex. A at 15).

19.    HCA's website also contains a "Guiding Principles" brochure where HCA delineates certain requirements and procedures for all HCA employees working at its hospitals, such as: 1) work schedules must be posted at least 14 days in advance; 2) employees shall be off at least one-half of the weekends, unless an employee requests a "weekend only" schedule; 3) a staff Call-off policy; 4) an RN Floating Policy; and 5) a mandatory overtime policy. (See Brochure, attached hereto as Exhibit B, at pp. 10-11). The brochure concludes with the following statement, "We are committed to making our facility a better place to work…a place where you can feel empowered to contribute to providing the best patient care possible. Thank you for being part of the HCA family, and know we are working hard to be an organization that makes you proud to be a part of it." (Ex. B at 12).

20.    HCA's control over its hospital subsidiaries is further explained in its 2013 Annual Report whereby HCA notes that:

a.  "Our[3] general, acute care hospitals typically provide a full range of services to accommodate such medical specialties as internal medicine, general surgery, cardiology, oncology, neurosurgery, orthopedics and obstetrics, as well as diagnostic and emergency services." (HCA's 2013 Annual Report to Stockholders at 3);

b.  "We are committed to providing the communities we serve with high quality, cost-effective health care while growing our business, increasing our profitability and creating long-term value for our stockholders. To achieve these objectives, we align our efforts around the following growth agenda:

    i.  Grow our Presence in Existing Markets. . . .

    ii.  Achieve Industry-Leading Performance in Clinical and Satisfaction Measures. . . .

    iii.  Recruit and Employ Physicians to Meet the Need for High Quality Health Services. . . .

    iv.  Continue to Leverage our Scale and Market Positions to Enhance Profitability. . . .

    v.  Selectively Pursue a Disciplined Development Strategy. . . ." (*Id.* at 60-61);

c.  "We receive payments for patient services from the federal government under the Medicare program, state governments under their respective Medicaid or similar

---

[3] In the Annual Report, the terms "Company," "HCA," "we," "our" or "us" refer to HCA and its "affiliates." "Affiliates" means its direct and indirect subsidiaries of HCA. (HCA's 2013 Annual Report to Stockholders at p. 3). Moreover, the terms "facilities" and "hospitals" explicitly refer to entities owned and operated by affiliates of HCA. *Id*.

Case 8:14-cv-02327-JSM-TBM   Document 24   Filed 10/15/14   Page 10 of 39 PageID 556

Herrera, et. al. v. JFK Medical Center, et. al.
Amended Complaint
Page 10

programs, managed care plans, private insurers and directly from patients." (*Id.* at

5);

d.   "Our hospitals generally offer discounts from established charges to certain group

purchasers of health care services, including private insurance companies,

employers, health maintenance organizations ("HMOs"), preferred provider

organizations ("PPOs") and other managed care plans, including plans offered

through the American Health Benefit Exchanges ("Exchanges"). These discount

programs generally limit our ability to increase revenues in response to increasing

costs." (*Id.* at 6);

e.   We provide discounts to uninsured patients who do not qualify for Medicaid or

charity care under our charity care policy. These discounts are similar to those

provided to many local managed care plans. In implementing the uninsured

discount policy, we attempt to qualify uninsured patients for Medicaid, other

federal or state assistance or charity care under our charity care policy. If an

uninsured patient does not qualify for these programs, the uninsured discount is

applied." (*Id.* at 6);

f.  "Although physicians may at any time terminate their relationship with a hospital we operate, our hospitals seek to retain physicians with varied specialties on the hospitals' medical staffs and to attract other qualified physicians. We believe physicians refer patients to a hospital on the basis of the quality and scope of services it renders to patients and physicians, the quality of physicians on the medical staff, the location of the hospital and the quality of the hospital's facilities, equipment and employees. Accordingly, we strive to maintain and provide quality facilities, equipment, employees and services for physicians and patients." (*Id*. at 17);

g.  "Our facilities are heavily concentrated in Florida and Texas, which makes us sensitive to regulatory, economic, environmental and competitive conditions and changes in those states. We operated 165 hospitals at December 31, 2013, and 78 of those hospitals are located in Florida and Texas. Our Florida and Texas facilities' combined revenues represented approximately 46% of our consolidated revenues for the year ended December 31, 2013." (*Id*. at 49) (emphasis removed);

h.  "We are committed to providing the communities we serve with high quality, cost-effective health care while growing our business, increasing our profitability and creating long-term value for our stockholders." (*Id*.  at 60);

i.  "At December 31, 2013, we owned and operated 42 hospitals and 32 surgery centers in the state of Florida. Our Florida facilities' revenues totaled $7.545 billion, $7.336 billion and $6.989 billion for the years ended December 31, 2013, 2012 and 2011, respectively." (*Id*. at 68).

21.    Upon information and belief, Defendant HCA exercises control over its hospitals, medical centers, and surgical centers, including Defendants JFK Medical Center, Memorial Hospital Jacksonville, and North Florida Regional Medical Center, by developing and controlling pricing practices, including pricing policies and practices for PIP-insured patients, and exerting control over its member hospitals' pricing policies, including the policy and practice to impose unreasonable and inflated rates upon PIP-insured patients.  The fact that HCA controls the subsidiary hospital defendants' pricing can be found on HCA's own website (which currently is linked to each of the Defendant Hospitals' websites), which states:

> HCA is pleased to introduce our pricing transparency initiative.  To best serve patients and provide a meaningful estimate of out of pocket expenses, our information is specific to each hospital.
>
> Clicking on a hospital name below will take you to the *Patient Financial Resource* site for that facility.  (You can also access your HCA hospital's *Patient Financial Resource* site by visiting that hospital's Web site and clicking on the "Patient Financial Information" button on the main page.) There you can get a pricing estimate for our most frequently used healthcare services, payment options and alternatives available to patients without healthcare coverage and contact information to call us directly for a pricing estimate.
>
> This is a groundbreaking healthcare initiative and we hope, through the information found on our site and our toll-free phone line to our Service Representatives, patients can learn more Pricing and Financial Information about the financial side of their healthcare needs.[4]

---

[4] *Available at* http://hcahealthcare.com/pricing-financing/.

*Cohen Milstein Sellers & Toll, PLLC*
*2925 PGA Boulevard, Suite 200, Palm Beach Gardens, FL 33410*
*Telephone: (561) 515-1400   Facsimile (561) 515-1401*

Case 8:14-cv-02327-JSM-TBM   Document 24   Filed 10/15/14   Page 13 of 39 PageID 559

Herrera, et. al. v. JFK Medical Center, et. al.
Amended Complaint
Page 13

22.     In addition to HCA's control of the subsidiary hospital defendants (as noted above), at all times and for all acts material hereto, all HCA-owned and operated Florida hospitals, medical centers, and surgical centers, including Defendants JFK Medical Center, Memorial Hospital Jacksonville, North Florida Regional Medical Center, also acted as the agents of Defendant HCA, and acted in the course and scope of their agency and were acting with the consent, permission, authorization, satisfaction, and knowledge of HCA, which ratified and approved of the actions of its hospitals, medical centers, and surgical centers.  As noted above, HCA acknowledged that each of these subsidiary hospitals were acting for the benefit of HCA when they provided services to the Plaintiffs; each subsidiary hospital acknowledged this; and HCA exercised control of the hospital subsidiaries with respect to its billing practices.

## III.   FACTUAL ALLEGATIONS

### A.   <u>The Florida PIP Statute</u>

23.     The Florida Motor Vehicle No-Fault Law requires all residents of Florida who own a motor vehicle to purchase PIP in the amount of $10,000 per person.  § 627.736(1), Fla. Stat.  PIP covers loss resulting from bodily injury, sickness, or disease arising out of the ownership, maintenance, or use of a motor vehicle if, *inter alia*, a physician, dentist, physician assistant, or advanced registered nurse practitioner has determined that the injured person had an emergency medical condition.  § 627.736(1)(a)(3), Fla. Stat.

24.     Under section 627.736(5)(a) of the PIP Statute, a physician, hospital, clinic, or other person or institution lawfully rendering treatment to an injured person for a bodily injury covered by PIP may charge the insurer and the injured party "only a reasonable amount pursuant to this section for the services and supplies rendered."  Further, such charge "may not exceed the amount the person or institution customarily charges for like services or supplies."  §627.736(5)(a), Fla. Stat.  The PIP Statute also explicitly defines the methodology for determining whether a charge for services or treatment is "reasonable":

> [C]onsideration may be given to evidence of usual and customary charges and payments accepted by the provider involved in the dispute, reimbursement levels in the community and various federal and state medical fee schedules applicable to motor vehicle and other insurance coverages, and other information relevant to the reasonableness of the reimbursement for the service, treatment, or supply.

*Id.*

25.     PIP covers only 80% of the charges incurred as a result of emergency medical care received, up to $10,000, § 627.736(1)(a)(3), Fla. Stat., thus leaving PIP-covered patients responsible for part of these charges.  Once the $10,000 of PIP coverage is exhausted, PIP-covered patients without another form of applicable insurance are responsible for 100% of any additional charges incurred.

B.      **HCA's Violation of PIP**

26.      When emergency care patients arrive at Defendant HCA's Florida hospitals,

including the Defendant hospitals, they are required to sign contracts of adhesion governing

the conditions of admission and treatment. Upon information and belief, emergency care

patients at all HCA facilities in Florida are required to sign the same or substantially similar

contracts as those used at JFK Medical Center, Memorial Hospital Jacksonville, and North

Florida Regional Medical Center. Although the contracts contain generic financial liability

provisions, they do not identify, describe, or specify the pricing terms or financial liability for

any signing patient. Although the contracts purport to require payments at the rates stated in

the hospital's "Charge Master" price list, the contracts do not contain a list of the Charge

Master prices or otherwise provide notification of what the amounts of those prices are.

27.      Because Defendants have never disclosed their Charge Master prices to Plaintiffs,

it is impossible for Plaintiffs to know whether they were billed at Defendants' Charge Master

rates for their PIP-covered emergency Radiological Services.  Regardless, pursuant to the PIP

Statute, the Defendant hospitals may charge only a "reasonable amount" for emergency

services and that amount "may not exceed the amount the [hospital] customarily charges for

like services or supplies." §627.736(5)(a), Fla. Stat. Any contractual provision that purports

to allow Defendants to charge in excess of the amount allowed by the PIP statute is void as a

matter of law.

28.      In direct contrast to the PIP Statute's requirement that hospitals charge only a

"reasonable amount," Defendants bill for emergency Radiological Services provided to PIP-

covered patients at grossly inflated, unreasonable rates.  Upon information and belief, the

Case 8:14-cv-02327-JSM-TBM   Document 24   Filed 10/15/14   Page 16 of 39 PageID 562

Herrera, et. al. v. JFK Medical Center, et. al.
Amended Complaint
Page 16

HCA hospitals and emergency facilities charge PIP patients rates for Radiological Services that are up to 65 times higher than the hospitals' usual and customary charges and/or payments accepted for similar Radiological Services for non-PIP patients. As a direct result of Defendants' billing at exorbitant and unreasonable rates, PIP emergency-care patients are billed more for their out-of-pocket portion of the rates charged for emergency Radiological Services than they would have been if such services were provided at reasonable rates. Defendants' exorbitant and unreasonable rates also deplete the PIP coverage available to the patients at a faster rate, resulting in the patients being billed out-of-pocket for additional medical services rendered by Defendants and third-party providers that would have otherwise been covered under PIP.

### C.    Plaintiff Herrera's Experience with HCA

29.    On or about April 9, 2013, Ms. Herrera was involved in an automobile accident. As a result of the accident, Ms. Herrera needed medical care and treatment, which she received through the emergency department at JFK Medical Center.  Upon admission, Ms. Herrera executed a "Conditions of Admission" form (attached as Exhibit C).  Among other things, the "Conditions of Admission" form had Ms. Herrera acknowledge that she agreed to pay "the rates stated in the hospital's price list (known as the 'Charge Master')."  The so-called "price list," however, was never provided to Ms. Herrera.

30.    The emergency room physician who treated Ms. Herrera ordered a CT scan of her cervical spine without contrast; a CT scan of her brain without contrast; an x-ray of her lumbar spine with 4 views; and an x-ray of her thoracic spine with 3 views.

Case 8:14-cv-02327-JSM-TBM   Document 24   Filed 10/15/14   Page 17 of 39 PageID 563

Herrera, et. al. v. JFK Medical Center, et. al.
Amended Complaint
Page 17

31.     JFK Medical Center billed the following exorbitant and unreasonable charges for these Radiological Services: $5,900 for the CT scan of her spine; $6,404 for the CT scan of her brain; $3,359 for the lumbar spine x-ray; and $2,222 for the thoracic spine x-ray.  (See Exhibit D).

32.     Because of the exorbitant and unreasonable amounts of these charges, Plaintiff Herrera's PIP coverage of $10,000 was prematurely exhausted, she was billed by JFK Medical Center for Radiological Services that were not paid by her PIP insurer, and she had to pay out of pocket for other medical services rendered by third party providers that would have otherwise been covered by her PIP benefits if not prematurely exhausted by the hospital's unreasonable charges. To date, Plaintiff Herrera has been billed over $6,500 by JFK Medical Center for Radiological Services.  She has also separately paid over $4,000 out of pocket for medical services rendered by third parties related to her automobile accident, and these charges would have been covered in full or in part by her PIP benefits if not prematurely exhausted by the exorbitant and unreasonable amounts of the hospital's charges.

### D.     Plaintiff Sanchez's Experience with HCA

33.     On or about May 1, 2013, Ms. Sanchez was involved in an automobile accident. As a result of the accident, Ms. Sanchez needed medical care and treatment, which she received through the emergency department at JFK Medical Center.  Upon admission, Ms. Sanchez executed a "Conditions of Admission" form (attached as Exhibit E).  Among other things, the "Conditions of Admission" form had Ms. Sanchez acknowledge that she agreed to pay "the rates stated in the hospital's price list (known as the 'Charge Master')."  The so-called "price list," however was never provided to Ms. Sanchez.

34.     The emergency room physician who treated Ms. Sanchez ordered a CT scan of her cervical spine without contrast; a CT scan of her brain without contrast; and an x-ray of her thoracic spine with 3 views.

35.     JFK Medical Center billed the following exorbitant and unreasonable charges for these Radiological Services: $5,900 for the CT scan of her spine; $6,404 for the CT scan of her brain; and $2,222 for the thoracic spine x-ray.  (See Exhibit F).

36.     Because of the exorbitant and unreasonable amounts of these charges, Plaintiff Sanchez's PIP coverage of $10,000 was prematurely exhausted, she was billed by JFK Medical Center for Radiological Services that were not paid by her PIP insurer, and she had to pay out of pocket for other medical services rendered by third party providers that would have otherwise been covered by her PIP benefits if not prematurely exhausted by the hospital's unreasonable charges. To date, Plaintiff Sanchez has been billed over $2,500 by JFK Medical Center for Radiological Services.  She has also separately paid over $2,000 out of pocket for medical services rendered by third parties related to her automobile accident, and these charges would have been covered in full or in part by her PIP benefits if not prematurely exhausted by the exorbitant and unreasonable amounts of the hospital's charges.

Case 8:14-cv-02327-JSM-TBM   Document 24   Filed 10/15/14   Page 19 of 39 PageID 565

Herrera, et. al. v. JFK Medical Center, et. al.
Amended Complaint
Page 19

E.    **Plaintiff Acosta's Experience with HCA**

37.    On or about October 11, 2013, Mr. Acosta was involved in an automobile accident.  As a result of the accident, Mr. Acosta needed medical care and treatment, which he received through the emergency department at Memorial Hospital Jacksonville.  Upon admission, Mr. Acosta executed a "Conditions of Admission" form (attached as Exhibit G). Among other things, the "Conditions of Admission" form had Mr. Acosta acknowledge that he agreed to pay "the rates stated in the hospital's price list (known as the 'Charge Master')." The so-called "price list," however was never provided to Mr. Acosta.

38.    The emergency room physician who treated Mr. Acosta ordered a CT scan of his cervical spine without contrast and a CT scan of his brain without contrast.

39.    Memorial Hospital Jacksonville billed the following exorbitant and unreasonable charges for these Radiological Services: $6965 for the CT scan of his spine; $6277 for the CT scan of his brain.  (See Exhibit H).

40.    Because of the exorbitant and unreasonable amounts of these charges, Plaintiff Acosta's PIP coverage of $10,000 was prematurely exhausted, he was billed by Memorial Hospital Jacksonville for Radiological Services that were not paid by his PIP insurer, and he had to pay out of pocket for other medical services rendered by third party providers that would have otherwise been covered by his PIP benefits if not prematurely exhausted by the hospital's unreasonable charges. To date, Plaintiff Acosta has been billed over $7,000 by Memorial Hospital Jacksonville for Radiological Services.  He has also been billed for medical services rendered by third parties related to his automobile accident, and these

Case 8:14-cv-02327-JSM-TBM   Document 24   Filed 10/15/14   Page 20 of 39 PageID 566

Herrera, et. al. v. JFK Medical Center, et. al.
Amended Complaint
Page 20

charges would have been covered in full or in part by his PIP benefits if not prematurely exhausted by the exorbitant and unreasonable amounts of the hospital's charges.

**F.      Plaintiff Wollmen's Experience with HCA**

41.      On or about February 5, 2014, Ms. Wollmen was involved in an automobile accident.  As a result of the accident, Ms. Wollmen needed medical care and treatment, which she received through the emergency department at North Florida Regional Medical Center.   Upon admission, Ms. Wollmen executed a "Conditions of Admission" form (attached as Exhibit I).  Among other things, the "Conditions of Admission" form had Ms. Wollmen acknowledge that she agreed to pay "the rates stated in the hospital's price list (known as the 'Charge Master')."  The so-called "price list," however was never provided to Ms. Wollmen.

42.      The emergency room physician who treated Ms. Wollmen ordered a CT scan of her cervical spine without contrast; a CT scan of her brain without contrast; and an x-ray of her thoracic spine with 3 views.

43.      North Florida Regional Medical Center billed the following exorbitant and unreasonable charges for these Radiological Services: $6853 for the CT scan of her cervical spine; $6140 for the CT scan of her brain; and $1454 for the x-ray of her thoracic spine.  (See Exhibit J).

44.    Because of the exorbitant and unreasonable amounts of these charges, Plaintiff Wollmen's PIP coverage of $10,000 was prematurely exhausted and she had to pay out of pocket for other medical services rendered by third party providers that would have otherwise been covered by her PIP benefits if not prematurely exhausted by the hospital's unreasonable charges. For instance, Plaintiff Wollmen has been billed for visits to a chiropractor for treatment related to her automobile accident, and these charges would have been covered in full or in part by her PIP benefits if not prematurely exhausted by the exorbitant and unreasonable amounts of the hospital's charges.

### G.    Plaintiffs and All Class Members Have Been Charged Unreasonable Rates for Radiological Services

45.    Defendants' charges to Plaintiffs Herrera, Sanchez, Acosta, and Wollmen, and to the Class Members, for CT scans of the cervical spine without contrast are unreasonable, exorbitant, and unfairly inflated:

a.    Each Plaintiff was billed in excess of $5,000 for a CT scan of the cervical spine without contrast.

b.    The Florida Medicare rates for a CT scan of the cervical spine without contrast range from approximately $213 to $220.  Defendants billed the Plaintiffs at a rate more than 25 times higher than the Medicare rate for the performance of a CT scan of the cervical spine without contrast.

    c.  Upon information and belief, Defendants' charges for CT scans of the cervical spine without contrast greatly exceed the amount Defendants usually and customarily charge for and the payment usually and customarily accepted for such service when billed to and paid by a private non-PIP insurer, such as an HMO or private medical insurer, including insurers that do not have a contract with Defendant HCA or the particular hospital that rendered the CT scan.

    d.  Upon information and belief, Defendants' charges for CT scans of the cervical spine without contrast greatly exceed the amount Defendants usually and customarily charge for and the payment usually and customarily accepted for such service when billed to and paid by an uninsured patient.

        1.  JFK Medical Center represents that it charges uninsured patients between $1,596 - $3,464 for a diagnostic CT Scan.[5]

        2.  Memorial Hospital Jacksonville represents that it charges uninsured patients between $1,696 - $1,924 for a diagnostic CT Scan.[6]

        3.  North Florida Regional Center represents that it charges uninsured patients between $1,881 - $3,326 for a diagnostic CT Scan. [7]

---

[5] *See* JFK's Pricing Estimates and Information - Uninsured Patients, *available at* http://jfkmc.com/patient-financial/index.dot?page_name=pricing_print, *last accessed* October 9, 2014.

[6] *See* Memorial Hospital Jacksonville's Pricing Estimates and Information - Uninsured Patients, *available at* http://memorialhospitaljax.com/patient-financial/index.dot?page_name=pricing_print, *last accessed* October 9, 2014.

[7] *See* North Florida Regional Medical Center's Pricing Estimates and Information - Uninsured Patients, *available at* http://nfrmc.com/patient-financial/index.dot?page_name=pricing_print, *last accessed* October 9, 2014.

e.  Upon information and belief, Defendants' charges for CT scans of the cervical spine without contrast greatly exceed the average amount non-HCA hospitals in the same market charge and accept for the same service.

f.  Upon information and belief, Defendants' charges for CT scans of the cervical spine without contrast greatly exceed Defendants' costs in providing such service.

46.  Defendants' Defendants' charges to Plaintiffs Herrera, Sanchez, Acosta, and Wollmen, and to the Class Members, for CT scans of the brain without contrast are unreasonable, exorbitant, and unfairly inflated:

a.  Each Plaintiff was billed in excess of $6,000 for a CT scan of the brain without contrast.

b.  The Florida Medicare rates for a CT scan of the brain without contrast range from approximately $164 to $169.  Defendants billed the Plaintiffs at a rate over 35 times higher than the Medicare rate for the performance of a CT scan of the brain without contrast.

c.  Upon information and belief, Defendants' charges for a CT scan of the brain without contrast greatly exceed the amount Defendants usually and customarily charge for and the payment usually and customarily accepted for such service when billed to and paid by a private non-PIP insurer, such as an HMO or private medical insurer, including insurers that do not have a contract with Defendant HCA or the particular hospital that rendered the CT scan.

    d.   Upon information and belief, Defendants' charges for a CT scan of the brain without contrast greatly exceed the amount Defendants usually and customarily charge for and the payment usually and customarily accepted for such service when billed to and paid by an uninsured patient.

        1.   JFK Medical Center represents that it charges uninsured patients between $1,596 - $3,464 for a diagnostic CT Scan.[8]

        2.   Memorial Hospital Jacksonville represents that it charges uninsured patients between $1,696 - $1,924 for a diagnostic CT Scan.[9]

        3.   North Florida Regional Center represents that it charges uninsured patients between $1,881 - $3,326 for a diagnostic CT Scan. [10]

    e.   Upon information and belief, Defendants' charges for a CT scan of the brain without contrast greatly exceed the average amount non-HCA hospitals in the same market charge and accept for the same service.

    f.   Upon information and belief, Defendants' charges for a CT scan of the brain without contrast greatly exceed Defendants' costs in providing such service.

---

[8] *See* JFK's Pricing Estimates and Information - Uninsured Patients, *available at* http://jfkmc.com/patient-financial/index.dot?page_name=pricing_print, *last accessed* October 9, 2014.

[9] *See* Memorial Hospital Jacksonville's Pricing Estimates and Information - Uninsured Patients, *available at* http://memorialhospitaljax.com/patient-financial/index.dot?page_name=pricing_print, *last accessed* October 9, 2014.

[10] *See* North Florida Regional Medical Center's Pricing Estimates and Information - Uninsured Patients, *available at* http://nfrmc.com/patient-financial/index.dot?page_name=pricing_print, *last accessed* October 9, 2014.

47.     Defendants' charges to Plaintiffs Sanchez, Herrera, and Wollmen, and to the Class Members, for thoracic spine x-rays with 3 views is unreasonable, exorbitant, and unfairly inflated:

    a.   Plaintiffs Sanchez and Herrera were billed in excess of $2,200 for thoracic spine x-rays with 3 views, and Plaintiff Wollmen was billed in excess of $1,400.

    b.   The Florida Medicare rates for an x-ray of the thoracic spine with 3 views are approximately $40.  Defendants billed the Plaintiffs at a rate more than 36 times higher than the Medicare rate for the performance of an x-ray of the thoracic spine with 3 views.

    c.   Upon information and belief, Defendants' charges for x-rays of the thoracic spine with 3 views greatly exceed the amount Defendants usually and customarily charge for and the payment usually and customarily accepted for such service when billed to and paid by a private non-PIP insurer, such as an HMO or private medical insurer, including insurers that do not have a contract with Defendant HCA or the particular hospital that rendered the x-ray.

    d.   Upon information and belief, Defendants' charges for x-rays of the thoracic spine with 3 views greatly exceed the amount Defendants usually and customarily charge for and the payment usually and customarily accepted for such service when billed to and paid by an uninsured patient.

    e.   Upon information and belief, Defendants' charges for x-rays of the thoracic spine with 3 views greatly exceed the average amount non-HCA hospitals in the same market charge and accept for the same service.

    f.   Upon information and belief, Defendants' charges for x-rays of the thoracic spine with 3 views greatly exceed Defendants' costs in providing such service.

48.    Defendants' charges to Plaintiff Herrera and the Class Members for lumbar spine x-rays with 4 views are unreasonable, exorbitant, and unfairly inflated:

    a.   Plaintiff Herrera was billed in excess of $3,000 for a lumbar spine x-ray with 4 views.

    b.   The Florida Medicare rates for an x-ray of the lumbar spine with 4 views are approximately $50.  Defendants HCA and JFK Medical Center billed Plaintiff Herrera at a rate more than 65 times higher than the Medicare rate for the performance of an x-ray of the lumbar spine with 4 views.

    c.   Upon information and belief, Defendants' charge for x-rays of the lumbar spine with 4 views greatly exceed the amount Defendants usually and customarily charge for and the payment usually and customarily accepted for such service when billed to and paid by a private non-PIP insurer, such as an HMO or private medical insurer, including insurers that do not have a contract with Defendant HCA or the particular hospital that rendered the x-ray.

    d.   Upon information and belief, Defendants' charges for x-rays of the lumbar spine with 4 views greatly exceed the amount Defendants usually and customarily charge for and the payment usually and customarily accepted for such service when billed to and paid by an uninsured patient.

e.   Upon information and belief, Defendants' charges for x-rays of the lumbar spine with 4 views greatly exceed the average amount non-HCA hospitals in the same market charge and accept for the same service.

f.   Upon information and belief, Defendants' charges for x-rays of the lumbar spine with 4 views greatly exceed Defendants' costs in providing such service.

49.   At no time prior to their admission to the emergency department were the Plaintiffs advised by Defendants that they would be charged such exorbitant and unreasonable prices for the Radiological Services that they required.  Furthermore, as a matter of law, Plaintiffs could not agree to the Defendants' exorbitant and unreasonable pricing for emergency Radiological Services in violation of the PIP Statute.

50.   As a direct result of Defendants' billing at exorbitant and unreasonable rates, Plaintiffs were damaged in at least one of two different ways:  (a) they were billed more for their out-of-pocket portion of the rates charged for Radiological Services than they would have been if such services were provided at reasonable rates; and (b) their PIP coverage was exhausted at a faster rate, resulting in Plaintiffs being billed for additional medical services rendered by Defendants and third party providers that would have otherwise been covered under PIP.

## IV. CLASS ACTION ALLEGATIONS

51.   Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 50.

52.     Pursuant to Florida Rules of Civil Procedure 1.220(a) and 1.220(b)(3), Plaintiffs bring this action on behalf of themselves and a class of all other persons similarly situated and defined as follows:

> All individuals (or their guardians or representatives) who received PIP-covered emergency care radiological services at an HCA-operated facility in Florida and who:  (a) were billed by the facility for any portion of the charges for such services; and/or (b) had their $10,000 of PIP coverage prematurely exhausted by the facility's charges for such services and, as a result, were billed for additional medical services rendered by the facility and/or third-party providers that would otherwise have been covered under PIP.

> Excluded from the Class are Defendants, any officers or directors thereof, together with the legal representatives, heirs, successors, or assigns of any Defendant, and any judicial officer assigned to this matter and his or her immediate family.

53.     This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements. Plaintiffs seek to represent an ascertainable Class with a well-defined community of interest in the questions of law and fact involved in this matter.

54.     Although the precise number of Class members is unknown and can only be determined through appropriate discovery, Plaintiffs believe and, on that basis, allege that the proposed Class is so numerous that joinder of all members would be impracticable.  Based on the number of patients that Defendants treat in their emergency care facilities following automobile accidents, it is apparent that thousands of consumers have been billed exorbitant prices for the medical services referenced herein such that the number of individual plaintiffs would make joinder impossible.

Case 8:14-cv-02327-JSM-TBM   Document 24   Filed 10/15/14   Page 29 of 39 PageID 575

Herrera, et. al. v. JFK Medical Center, et. al.
Amended Complaint
Page 29

55.     Questions of law and fact common to the Plaintiff Class exist that predominate over questions affecting only individual members, including *inter alia*:

a.   Whether Defendants' charges to PIP patients for Radiological Services were "reasonable";

b.   Whether Defendants had a policy and practice of pricing, billing, and seeking payment from PIP patients for Radiological Services at unreasonable rates;

c.   Whether Defendants' inclusion of a provision in its Conditions of Admission contracts requiring patients to make payments according to Defendants' Charge Master rates a violation of the PIP Statute and void as a matter of law;

d.   Whether Defendants' practices of overcharging for Radiological Services were deceptive, unlawful, or unfair in any respect thereby violating Florida's Deceptive and Unfair Trade Practices Act. (FDUPTA), Fla. Stat. § 501.201, *et seq.*;

e.   Whether Defendants' practices of overcharging for Radiological Services constituted a breach of contract; and

f.   Whether Defendants' conduct injured the putative Class members and, if so, the extent of the damages.

56.     Plaintiffs are members of the putative Class.  The claims asserted by the Plaintiffs in this action are typical of the claims of the members of the putative Class, as the claims arise from the same course of conduct by the Defendants and the relief sought is common. Defendants overcharged Plaintiffs for the same Radiological Services and received only partial payment for those services from the Plaintiffs' PIP insurance carriers. Plaintiff were then left with the remaining outstanding balance on their hospital bills and/or were billed for

additional medical services rendered by Defendants and third party providers that would have otherwise been covered under PIP had Defendants' inflated charges not prematurely exhausted the coverage.

57. Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Class, as their interests are coincident with, not antagonistic to, the other Class members. Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation.

58. Certification of the Class is appropriate pursuant to Florida Rule of Civil Procedure 1.220 because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it would be highly unlikely that the members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

59. A class action is an appropriate method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

60.    The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

## COUNT I – Violation of Florida's Deceptive and Unfair Trade Practices Act Against All Defendants

61.    Plaintiffs re-allege and reaffirm herein all of the allegations contained in paragraphs 1 through 60.

62.    In Florida, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

63.    Plaintiffs, individually, and the members of the putative Class are "consumers" within the meaning of Florida Statute Section 501.203.

64.    Defendants' practice of charging exorbitant and unreasonable rates for PIP-covered Radiological Services following motor vehicle accidents constitutes unfair, deceptive, or unconscionable trade practices in violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") as provided by §§ 501.201-.213, Florida Statutes.

65.    Failure to disclose material information may cause deception within the meaning of FDUTPA.  Such deception has occurred here as Defendants have failed to disclose important material information concerning their inflated pricing scheme to PIP-insured patients prior to or at the time of the provision of emergency medical treatment and services, including the failure to provide Plaintiffs with the Charge Master price list despite purporting to incorporate those prices into the contracts of adhesion that Plaintiffs were required to sign prior to receiving emergency medical services.

66.     Defendants engage in the unfair and deceptive trade practices described herein in violation of the PIP Statute, which prohibits them from charging more than a "reasonable amount" for emergency medical services billed under PIP.  Defendants utilize the patients' PIP coverage as a means to bill and be paid for unreasonable, inflated charges for emergency Radiological Services.

67.     Defendants' pricing practices with regard to PIP-insured patients are unconscionable and constitute unfair and deceptive methods of competition in violation of one or more of the following:

    a.   The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or by the federal courts, as set forth in FDUTPA, §§ 501.203(3)(b) and 501.204; and/or

    b.   The law against unfair and deceptive trade practices set forth in 15 U.S.C. §§ 45(a)(1) and incorporated into FDUTPA under §501.204(2), or the law against unfair and deceptive trade practices as set forth in FDUTPA § 501.203(3)(c); and/or

    c.   The violation of § 627.736(5)(a), Florida Statutes, which prohibits hospitals and other medical providers from charging more than a reasonable amount for treating PIP-covered patients; and/or

*Cohen Milstein Sellers & Toll, PLLC*
*2925 PGA Boulevard, Suite 200, Palm Beach Gardens, FL 33410*
*Telephone: (561) 515-1400   Facsimile (561) 515-1401*

    d.  The violation of § 627.736(5)(a), Florida Statutes, which prohibits hospitals and other medical providers from charging for PIP-covered medical services at rates in excess of their customary charges for like services.

68.  Defendants' conduct amounts to "unfair" business practices insofar Defendants fail to charge Plaintiffs and Class members reasonable rates as required by the PIP Statute. Defendants' practices offend established public policies, and are immoral, unethical, oppressive, and unscrupulous. Once Defendants' emergency facilities' billing department determines that a patient's medical care will be covered by PIP insurance, Defendants' practice of overcharging the patient is triggered and carried out by the submission of the bills to the PIP insurance carrier.

69.  Defendants' conduct also constitutes "deceptive" business practices within the meaning of FDUTPA in that Defendants fail to inform and/or conceal from PIP-insured patients their uniform policy of billing unreasonable rates and requiring payment for Radiological Services covered by PIP at rates several times higher than Defendants' usual and customary rates for and/or payments accepted for the same or substantially similar services; and/or at rates substantially higher than the cost to Defendants for the provision of the services.

70.  Defendants' conduct also constitutes an unfair or deceptive business practice within the meaning of FDUTPA in that Defendants require emergency care patients, including Plaintiffs and the putative Class members, to sign contracts of adhesion that purport to expressly incorporate Defendants' Charge Master price list, but fail to contain a

list of the Charge Master prices or otherwise provide notification of what the amounts of those prices are.

71.     As a result of these unfair and deceptive trade practices, Plaintiffs individually, and the members of the putative Class, have suffered actual damages in that they have paid and/or become obligated to pay excessive and artificially inflated medical bills for emergency radiological services as a result of Defendants' billing policies, and are entitled to their actual damages, and/or have paid or become obligated to pay other health care providers out-of-pocket because the Defendants' inflated rates prematurely exhausted their PIP coverage.

72.     As a result of the aforementioned conduct, Plaintiffs individually, and the members of the putative Class, are entitled to permanent injunctive relief to prevent Defendants from continuing to engage in these unfair and deceptive trade practices and to stop all efforts to collect excess unpaid charges.

73.     Pursuant to Florida Statute Section 501.2105, Plaintiffs, individually, and as members of the putative Class, are entitled to recover costs and reasonable attorneys' fees in this action.

## COUNT II – Breach of Contract Claim Against All Defendants

74.     Plaintiffs re-allege and reaffirm herein all of the allegations contained in paragraphs 1 through 60.

75.     Plaintiffs entered into a contract with Defendants' emergency care facilities titled "Conditions of Admission" upon entering the emergency department.  Each of the Plaintiffs entered into the exact same or substantially similar contract with the Defendants with the

same or substantially similar terms.  Each of the putative Class members entered into the same or substantially similar contract with one of Defendant HCA's Florida facilities.  A copy of each of the Plaintiffs' contracts is attached hereto. (Exs. C, E, G, I).

76.    The "Conditions of Admission" contract provides that Plaintiffs "promise to pay the patient's account at the rates stated in the hospital's price list (known as the 'Charge Master') effective on the date the charge is processed for the service provided, which rates are hereby expressly incorporated by reference as the price term of this agreement to pay the patient's account."

77.    Plaintiffs were not provided a copy of the hospital's price list at the time of their admission.  As a result of the Contracts' vague, ambiguous, undefined, and nondescript pricing term, applicable law implies a contractual obligation on Plaintiffs to pay for no more than the reasonable value services provided under the Contracts, and a corresponding obligation on Defendants to bill for no more than the reasonable value of the services provided under the Contracts.

78.    Moreover, as the substance of the Contracts is the subject of statutory regulation under the PIP Statute, the parties are presumed to have entered into their agreement with reference to such statutory regulation.  The requirement on Defendants to bill no more than a reasonable amount for PIP-covered services, as provided in the PIP Statute, is therefore part of the contract between Defendants and Plaintiffs, and any contractual clause that purports to allow Defendants to bill more than a reasonable rate is void as a matter of law.

79.    Under Florida law, Defendants breached the Contracts by charging unreasonable amounts for PIP-covered Radiological Services that are several times higher than

reimbursement rates from other categories of patients signing the same Contract, several times higher than the cost to Defendants for providing the treatment and services, and several times higher than the reasonable value of the treatment and services provided.

80.     As a result of Defendants' breach of contract, Plaintiffs have been damaged in that they have paid and/or become obligated to pay excessive, artificially inflated, and unreasonable medical bills for Radiological Services or other PIP-covered medical services.

### COUNT III –Breach of the Implied Covenants of Good Faith and Fair Dealing Against All Defendants

81.     Plaintiffs re-allege and reaffirm herein all of the allegations contained in paragraphs 1 through 60.

82.     As the substance of the Conditions of Admission contracts is the subject of statutory regulation under the PIP Statute, the obligation that statute imposes on Defendants to charge no more than a reasonable rate is incorporated into the contracts.  The requirement on Defendants to bill no more than a reasonable amount for PIP-covered services, as provided in the PIP Statute, is therefore part of the contract between Defendants and Plaintiffs and Class Members.

83.     As a result of Defendants' breach of the implied covenant of good faith and fair

dealing, Plaintiffs have been damaged in that they have paid and/or become obligated to pay

excessive, artificially inflated, and unreasonable medical bills for Radiological Services or

other PIP-covered medical services.

**WHEREFORE,** Plaintiffs Marisela Herrera, Luz Sanchez, Nicholas Acosta, and Penny

Wollmen, individually and on behalf of all others similarly-situated, demand judgment against

Defendants, JFK Medical Center Limited Partnership, doing business under the name JFK

Medical Center; Memorial Healthcare Group, Inc., doing business under the name Memorial

Hospital Jacksonville; North Florida Regional Medical Center, Inc.; and HCA Holdings, Inc., for

injunctive relief, damages, interest, and costs and, all other relief deemed just and proper under

the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all matters triable as of right by a jury.

DATED this 15th day of October, 2014.

Respectfully submitted,

s/Theodore J. Leopold
Theodore J. Leopold (FL Bar No. 705608)
Leslie M. Kroeger (FL Bar No. 989762)
Diana L. Martin (FL Bar No. 624489)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL  33410
Telephone:  (561) 515-1400
Facsimile:   (561) 515-1401

Herrera, et. al. v. JFK Medical Center, et. al.
Amended Complaint
Page 38

Kimberly L. Boldt (FL Bar. No. 957399)
**BOLDT LAW FIRM**
215 S. 21st Avenue
Hollywood, FL  33020
Telephone:  (954) 921-2225
Facsimile:  (954) 921-2232

Charles E. Cartwright (FL Bar No. 983953)
Adriana Gonzalez (FL Bar No. 0060544)
**GONZALEZ, CARTWRIGHT & RIVERA P.A.**
813 Lucerne Avenue
Lake Worth, FL  33460
Telephone:  (561) 533-0345
Facsimile:  (561) 533-0195

Andrew N. Friedman, *pro hac vice*
Matthew S. Axelrod, *pro hac vice*
Douglas J. McNamara, *pro hac vice*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:   (202) 408-4699

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on Wednesday, October 15, 2014, I electronically filed the foregoing

document with the Clerk of the Court using *CM/ECF*.  I also certify that the foregoing document

is being served this day on all counsel of record identified on the following Service List via

transmission of Notices of Electronic Filing generated by *CM/ECF*.

s/Theodore J. Leopold
Theodore J. Leopold (FL Bar No. 705608)

## SERVICE LIST

**BUCHANAN INGERSOLL &ROONEY PC
|
FOWLERWHITE BOGGS**
P.O. Box 1438
Tampa, FL 33601
Tel: (813) 228-7411
Fax: (813) 229-8313

Edward M. Waller, Jr., Esq.
Florida Bar No. 0106341
edward.waller@bipc.com

John D. Emmanuel, Esq.
Florida Bar No. 0475572
john.emmanuel@bipc.com

Ashley Bruce Trehan, Esq.
Florida Bar No. 0043411
ashley.trehan@bipc.com

***Counsel for Defendant HCA Holdings, Inc.***

**CARLTON FIELDS JORDEN BURT P.A.**
100 SE Second Street, Suite 4200
Miami, FL 33131
Telephone: (305) 530-0050
Facsimile: (305) 530-0055

Thomas Meeks, Esq.
Florida Bar No. 314323
tmeeks@cfjblaw.com (Primary)
dwasham@cfjblaw.com (Secondary)
miaecf@cfdom.net (Secondary)

Walter J. Taché, Esq.
Florida Bar No. 28850
wtache@cfjblaw.com (Primary)
bwithers@cfjblaw.com (Secondary)
miaecf@cfdom.net (Secondary)

***Counsel for JFK Medical Center Limited
Partnership d/b/a JFK Medical Center***